Theresa Weston SAUNDERS, Plaintiff,

v.

**DISTRICT OF COLUMBIA,**
et al., Defendants.

Civil Action No. 02–1803(CKK).

United States District Court,
District of Columbia.

Aug. 2, 2013.

Opinion Denying Reconsideration
Sept. 17, 2013.

---

3. An Order consistent with this Memorandum Opinion will be issued contemporaneously.

Alex Karpinski, Office of the Attorney General, District of Columbia, Washington, DC, Mark D. Back, Youth Services Administration, Laurel, MD, for Defendants.

## MEMORANDUM OPINION

COLLEEN KOLLAR–KOTELLY, District Judge.

Plaintiff Teresa Saunders filed suit against the District of Columbia, Natwar Gandhi, and Earl Cabbell asserting a number of claims arising out of the Plaintiff's termination from employment with the District. The Defendants now seek summary judgment on each of the Plaintiff's three remaining claims: retaliation in violation of the False Claims Act, racial discrimination in violation of 42 U.S.C. § 1981, and deprivation of liberty without due process in violation of 42 U.S.C. § 1983. The Plaintiff does not oppose the Defendants' motion with respect to her claims under sections 1981 and 1983, but contends her claim of retaliation in violation of the False Claims Act should go to a jury. Upon consideration of the pleadings,[1] the relevant legal authorities, and the summary judgment record, the Court finds the Plaintiff failed to set forth a prima facie case of retaliation under the False Claims Act. Accordingly, the Defendants are entitled to summary judgment on all remaining claims in this case.

## I. BACKGROUND

The Plaintiff was employed in various financial management positions with the District of Columbia from August 1982 through July 2000. Defs. Stmt. ¶ 1.[2] In

Wendy Lee Kahn, Zwerding, Paul, Kahn & Wolly, PC, Washington, DC, for Plaintiff.

1. Defs.' Mot. for Summ. J. ("Defs.' Mot."), ECF No. [101]; Pl.'s Opp'n, ECF Nos. [105, 107]; Defs.' Reply, ECF No. [110]. The Plaintiff also sought leave to file a sur-reply. Pl.'s Mot. for Leave, ECF No. [111]. None of the issues identified as topics for the Plaintiff's sur-reply are material to the Court's dis-

position of this case, therefore the Court denies the Plaintiff's motion.

2. The Court shall refer to Defendants' Statement of Material Facts ("Defs.' Stmt."), or directly to the record, unless a statement is contradicted by the Plaintiff, in which case the Court may cite to Plaintiff's Response to

June 1999, City Administrator Norman Dong and Chief Financial Officer for the District of Columbia Valerie Holt assigned the Plaintiff to serve as the Chief Financial Officer of the Office of the Chief Technology Officer ("OCTO"). Pl.'s Ex. C (Holt Decl.) ¶¶ 8. The Plaintiff was tasked with preparing financial statements for the expenditure of federal funds in connection with the District of Columbia's "Y2K" conversion program. *Id.* Suzanne Peck served as the Chief Technology Officer while the Plaintiff worked on the Y2K project. *E.g.,* Pl.'s Ex. H (Saunders Decl.) ¶ 7. As the Chief Financial Officer for the OCTO, the Plaintiff worked closely with the OCTO, but continued to report to Valerie Holt. *Id.* at ¶ 10; Pl.'s Ex. J (Natwar Dep.) at 19:15–10:3; *see also* Natward Dep. at 20:4–9 (indicating that CFOs assigned to specific agencies "are supposed to work very closely" with the assigned agency, but "it's only the [District] CFO who is their boss").

While serving as the Chief Financial Officer of OCTO, the Plaintiff alleges that she "discovered and reported numerous deficiencies in procurement and financial management operations," including that in many cases OCTO contracts did not comply with District and federal regulations. Def.'s Stmt. ¶¶ 3, 4.[3] The Plaintiff produced a "Financial Status Report" for the Y2K project on July 9, 1999, which indicated that "[t]he internal controls for the process of approving and reporting financial transactions may require strengthening," and that "[t]hese potential internal control deficiencies could adversely affect the District's ability to record, process, summarize, and report financial data consistent with governmental accounting reporting requirements." Pl.'s Ex. H (Saun-

ders Decl.), Attach. 1 (7/9/1999 Report) at 2. The Plaintiff alleges Ms. Peck was "furious" at the Plaintiff for submitting the July 9, 1999, report, stating that: Ms. Peck "stood at the door of my office and threw the report on the floor near my feet and yelled at me; she yelled she would get me out of OCTO." Saunders Decl. ¶ 18. Ulysses Little, who worked for the Plaintiff on the Y2K project, likewise indicated that when the Plaintiff "started pointing out inconsistencies and other problems to Ms. Peck, Ms. Peck's attitude and behavior toward Ms. Saunders and the team changed dramatically. The environment became very tense and intimidating." Pl.'s Ex. E (Little Decl.) ¶ 6. Ms. Peck also expressed dissatisfaction towards the Plaintiff at having to attend regular status meetings regarding the Y2K project as a result of the Plaintiff's report. Saunders Decl. ¶ 22.

In August 1999, Ms. Peck reportedly complained to the District of Columbia Financial Control Board that the Plaintiff refused to reimburse expenses incurred by certain contractors, including "21 Critical Items" totaling over $21,000,000. Saunders Decl. ¶ 26. Upon learning of Ms. Peck's complaint from Valerie Holt, the Plaintiff submitted a memorandum to the Control Board, explaining why the Plaintiff declined to authorize payment of various invoices. Saunders Decl., Attach. 2 (8/27/1999 Mem. T. Saunders to W. Parker); *see also id.* (explaining that "$18,014,000 was rejected because no budget or funding existed"). The Plaintiff asserts that the Control Board agreed with her actions but that Ms. Peck was angry with the Plaintiff. Saunders Decl. ¶¶ 27–28.

---

Defendants' Statement of Undisputed Material Facts ("Pl.'s Resp. Stmt.").

**3.** The Court makes no finding as to whether the Plaintiff's conduct as described in this section constituted "protected activity" for purposes of the False Claims Act.

Four days after submitting her memorandum to the Control Board, the Plaintiff submitted a memorandum to Ms. Peck, copying Norman Dong and Valerie Holt among others, concerning the "[v]alidation of IBM [i]nvoices." Saunders Decl., Attach. 3 (8/31/1999 Report).[4] The report indicated, among other things, that supporting documentation was not available for four invoices totaling $7,194,855.60, and a total of $13,812,508 was disallowed because the expenditures were "incurred without the appropriate budget authority." *Id.* at 2. The report also recommended "based on the discrepancies identified in the labor hours charged, that a thorough review be conducted by the Y2K Program office for other related costs (such as travel claims) that have been included in the invoices to provide assurances that all costs are accurate and appropriate." *Id.* at 6. Ms. Peck was angered by the report, and purportedly told the Plaintiff that "she would make sure [the Plaintiff] would not be a CFO in the D.C. Government anywhere." Saunders Decl. ¶ 32.

At some unspecified point Ms. Peck asked Ms. Holt to replace the Plaintiff as the Chief Financial Officer for the OCTO, but Ms. Holt declined to do so. Holt Decl. ¶ 20. Ms. Holt indicates that "Ms. Peck kept trying however, and at one point the Mayor's Chief of Staff told [Holt] that Peck wasn't happy about [Holt's] unwillingness to change CFOs and wasn't there something [Holt] could do." *Id.* On October 10, 1999, Valerie Holt transferred Plaintiff to the position of Chief Financial Officer for the District of Columbia Lottery. Saunders Decl. ¶ 40. The Plaintiff did not request the transfer, but was "pleased to assume" the position at the D.C. Lottery. *Id.* at ¶ 41. Ms. Holt explained that she "knew that Ms. Saunders'

situation at OCTO was very stressful so the move to [sic] Lottery seemed to make sense." Holt Decl. ¶ 21.

Valerie Holt's appointment as Chief Financial Officer for the District expired in May 2000. Holt Decl. ¶ 22. Mayor Anthony Williams appointed Dr. Natwar Gandhi to replace Ms. Holt in late May. Pl.'s Ex. J (Natwar Dep.) at 15:3–13. Prior to his appointment as Chief Financial Officer, Dr. Gandhi served for approximately two years as a tax commissioner, reporting to Anthony Williams before Mr. Williams' successful run for Mayor. *Id.* at 13:1–5; 14:12–18. Dr. Gandhi appointed Stanley Jackson to serve as his chief of staff. Defs.' Stmt. ¶ 11. The Plaintiff alleges that Mr. Jackson contacted the Plaintiff in late May 2000 to inquire whether the Plaintiff would be interested in joining a "Special Projects Team" led by Earl Cabbell. Saunders Decl. ¶ 44. The Plaintiff informed Mr. Jackson that she was not interested in the position, but on June 19, 2000, the Plaintiff was transferred to the Special Projects Team. *Id.* at ¶ 45.

The Plaintiff attended a "[k]ick-off" meeting for the Special Projects Team on June 22, 2000, and was "introduced as part of the team." Saunders Decl. ¶ 48. The parties disagree significantly as to what transpired next. The Plaintiff claims that Mr. Cabbell agreed to provide the Plaintiff with a "transition period," and that she began working fulltime on the team on June 29, 2000. *Id.* at ¶¶ 46, 48. With advanced notice, the Plaintiff took off one morning, but otherwise asserts she was not absent from work after June 29. *Id.* at ¶ 55. By contrast, Mr. Cabbell testified that the Plaintiff informed him that "[s]he had to work through a transition phase with whoever the new CFO was" for the

4. At some point the Plaintiff also provided her August 31, 1999, report to the United States Department of the Treasury, the Office of Management and Budget, and the United States Government Accountability Office. Saunders Decl. ¶ 33.

Lottery, while Mr. Cabbell was under the impression she would be available to the Special Projects Team immediately. Pl.'s Ex. I (Cabbell Dep.) at 81:6–82:5; 83:14–84:8. Mr. Cabbell reported his confusion to Stanley Jackson, who indicated he would "take care of it." *Id.* at 84:10–85:5. The Plaintiff subsequently appeared at the offices for the Special Projects Team, but not on a full-time basis. *Id.* at 86:18–25. Mr. Cabbell testified at his deposition that the Plaintiff "participated in a few things, but then she would leave, would only be there a half day or whatever saying she had to go back" to the Lottery. *Id.* at 88:14–17. Mr. Cabbell once again asked Mr. Jackson when the Plaintiff would be available to the Special Projects Team full-time. *Id.* at 88:17–89:3; *but see* Pl.'s Ex. D (Jackson Decl.) ¶ 8–9 (indicating that he "do[es] not remember hearing these statements from Cabbell"). Regardless of what transpired after June 19, 2000, the parties agree that on July 21, 2000, the Office of the Chief Financial Officer terminated the Plaintiff. Pl.'s Ex. M (7/21/2000 Termination Ltr.). This suit followed.

## II. LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials); or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse

party cannot produce admissible evidence to support the fact.

Fed.R.Civ.P. 56(c)(1). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may ... consider the fact undisputed for purposes of the motion." Fed. R.Civ.P. 56(e). When considering a motion for summary judgment, the court may not make credibility determinations or weigh the evidence; the evidence must be analyzed in the light most favorable to the nonmoving party, with all justifiable inferences drawn in his favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "If material facts are at issue, or, though undisputed, are susceptible to divergent inferences, summary judgment is not available." *Moore v. Hartman,* 571 F.3d 62, 66 (D.C.Cir.2009) (citation omitted).

The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The mere existence of a factual dispute, by itself, is insufficient to bar summary judgment. *See Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. 2505. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* For a dispute about a material fact to be "genuine," there must be sufficient admissible evidence that a reasonable trier of fact could find for the nonmoving party. *Id.* The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. 2505. "If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. 2505 (inter-

nal citations omitted). The adverse party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Conclusory assertions offered without any factual basis in the record cannot create a genuine dispute. *See Ass'n of Flight Attendants–CWA v. U.S. Dep't of Transp.,* 564 F.3d 462, 465–66 (D.C.Cir.2009).

## III. DISCUSSION

The Defendants moved for summary judgment with respect to each of the Plaintiff's remaining claims. The Plaintiff elected not to oppose the Defendant's motion for summary judgment with respect to her racial discrimination and due process claims. Pl.'s Opp'n at 29–30. The only question remaining for the Court is whether the Defendants are entitled to summary judgment on the Plaintiff's claim that her termination was in retaliation for the Plaintiff engaging in protected activity, and thus in violation of the False Claims Act.

 At the time the Plaintiff's claim accrued, the False Claims Act provided that

> Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others *in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section,* shall be entitled to all relief necessary to make the employee whole. Such relief shall include reinstatement with the same seniority status such employee would have had but for the discrimination, 2 times the amount of back

pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees. An employee may bring an action in the appropriate district court of the United States for the relief provided in this subsection.

31 U.S.C. § 3730(h) (2000) (emphasis added). Enacted in 1986, this section was "designed to protect persons who assist the discovery and prosecution of fraud and thus to improve the federal government's prospects of deterring and redressing crime." *Neal v. Honeywell Inc.,* 33 F.3d 860, 861 (7th Cir.1994), *abrogated on other grounds by Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson,* 545 U.S. 409, 416–17, 125 S.Ct. 2444, 162 L.Ed.2d 390 (2005). "This language states two basic elements: (1) acts by the employee 'in furtherance of' a suit under § 3730—acts also known as 'protected activity'; and (2) retaliation by the employer against the employee 'because of' those acts." *United States ex rel. Schweizer v. Oce N.V.,* 677 F.3d 1228, 1237 (D.C.Cir.2012). The *McDonnell Douglas* burden-shifting framework governs the Court's analysis of the Plaintiff's retaliation claim. *Schweizer,* 677 F.3d at 1241.

> Adapting McDonnell Douglas to the FCA's anti-retaliation provision, a plaintiff first must set forth a prima facie case of retaliation. Once this is accomplished, the burden then shifts to the defendant to articulate a legitimate, nonretaliatory reason for the adverse employment action. This imposes merely a burden of production, not one of proof. Thus, if the employer produces evidence of a legitimate nonretaliatory reason, the plaintiff must assume the further burden of showing that the proffered reason is a pretext calculated to mask retaliation.

*Harrington v. Aggregate Industries Ne. Region, Inc.*, 668 F.3d 25, 31 (1st Cir.2012) (citations omitted). With respect to the second element of the cause of action, "[i]n order to make out a prima facie case at the summary judgment stage . . . [the] plaintiff is required to produce evidence of retaliation sufficient for a reasonable jury to conclude that [her] protected activity was a contributing factor in the alleged prohibited personnel action." *Payne v. District of Columbia*, 722 F.3d 345, 353 (D.C.Cir. 2013).

▪ The parties devote most of their pleadings to the first element of a prima facie case of retaliation: whether the Plaintiff engaged in protected activity. The Court does not reach this question because the Plaintiff failed to put forth sufficient evidence to create a genuine issue of material fact regarding whether her purported protected activity was a motivating factor in the Plaintiff's termination. The entirety of the Plaintiff's argument regarding causation is as follows:

> CFO Holt, who had resisted Ms. Peck's efforts to remove Ms. Saunders, was—effective mid–May 2000, no longer CFO. Instead, Natwar Gandhi, with closer ties to Mayor Williams, became CFO and Ms. Saunders' boss; and Earl Cabbell, also with close ties to Mayor Williams assumed a key role in dealing with Ms. Saunders. During the period of the adverse actions against Ms. Saunders, the Pecks were giving significant financial support to the Mayor Williams' hotly-contested school governance reform effort. . . . The coincidence that almost immediately after Ms. Holt's leaving and Dr. Gandhi's assuming the CFO position did the government abruptly and suddenly move against Ms. Saunders begs for an explanation.

Pl.'s Opp'n at 20–21. In other words, the Plaintiff's "prima facie" case of causation rests entirely on the fact that (1) Ms. Peck

was "politically connected" to Mayor Williams; (2) Dr. Gandhi had "closer ties" to Mayor Williams than his predecessor Ms. Holt had to the Mayor; and (3) the Plaintiff was terminated two months after Dr. Gandhi was appointed.

Citing only to her own declaration, the Plaintiff asserts that it was "well-known that Suzanne Peck was politically well-connected" at the time of Plaintiff's termination. Saunders Decl. ¶ 58. "[A] few of [the Plaintiff's] D.C. colleagues mentioned they believed Peck and/or husband [sic] had made significant contributions to Mayor Williams or causes he supported." *Id.* The Plaintiff submitted a "contributor report" indicating that Ms. Peck contributed $5,000 to the "Better Schools Political Action Committee" on November 2, 2000—over three months after the Plaintiff's termination. Pl.'s Ex. P. The Plaintiff also produced a contributor report reflecting a $40,000 donation from an individual named Paul Peck to the New School Leadership Committee. Pl.'s Ex. O. Based on a press release provided by Plaintiff, it appears the New School Leadership Committee supported an education ballot measure backed by the Mayor. Pl.'s Ex. N (6/23/2000 Press Releases). Nevertheless, the Plaintiff offers no evidence—direct or circumstantial—demonstrating any communications between the Plaintiff and Mayor Williams or his staff after the Plaintiff left the OCTO.

There is no evidence in the record that the individual who fired the Plaintiff (Dr. Gandhi) was aware of the Plaintiff's purported protected activities, all of which occurred over eight months before Dr. Gandhi was appointed as Chief Financial Officer. There is no evidence to suggest that Stanley Jackson was aware of the Plaintiff's purported activities, which occurred over eight months before Mr. Jackson was appointed Dr. Gandhi's chief of

staff. The *Plaintiff* submitted a declaration from Mr. Jackson in support of her claims, but Mr. Jackson does not indicate that he had any knowledge of the Plaintiff's work on the Y2K project. *See generally* Pl.'s Ex. D. Nor is there any evidence that the Plaintiff's supervisor (Mr. Cabbell) was aware of the Plaintiff's purported protected activities, the last of which occurred over nine months before the Plaintiff was assigned to the Special Projects Team. To the contrary, Mr. Cabbell denied knowing anything about the issues concerning financial statements from OCTO for the Y2K project, and the Plaintiff offers no evidence to rebut Mr. Cabbell's testimony. Cabbell Dep. 70:18–23.

Moreover, there is no evidence in the record to suggest Dr. Gandhi or Mr. Cabbell had any contact with Mayor Williams or Ms. Peck regarding the Plaintiff prior to her termination. "All [Saunders] really offers is evidence that [s]he made a protected disclosure and that at a later time [s]he suffered a termination. The fact that one event precedes another does not in itself evidence causation." *Payne,* 722 F.3d at 354.

Apart from the gaping evidentiary holes, the Plaintiff also fails to articulate any theory as to how the political connections emphasized in her brief led to her termination. It is unclear whether the Plaintiff is implying that Ms. Peck knew Dr. Gandhi and asked him to terminate the Plaintiff, or whether the Plaintiff believes Ms. Peck convinced Mayor Williams to ask Dr. Gandhi to terminate the Plaintiff. This omission is significant because the only individual the Plaintiff suggests was upset by her protected activity was not the Plaintiff's supervisor (or even within her office), and was not directly responsible for the Plaintiff's termination. Absent any explanation as to how allegedly Ms. Peck was involved in the Plaintiff's termination, the Court cannot determine whether the ulti-mate decision maker can be imputed with any retaliatory intent *Ms. Peck* might have harbored. On this record, the Plaintiff failed to set forth a prima facie case that her termination was motivated by her alleged protected activity.

## IV. CONCLUSION

The Plaintiff devotes large portions of her opposition to disputing the District's proffered reason for her termination. However, the Court cannot reach any of the Plaintiff's arguments because the Plaintiff failed to produce sufficient evidence from which a reasonably jury could conclude that the Plaintiff's alleged protected activity was a motivating factor in her termination. The Plaintiff failed to satisfy her preliminary burden to establish a prima facie case of retaliation, thus the Defendants are entitled to summary judgment on the Plaintiff's False Claims Act charge, in addition to the claims the Plaintiff conceded. Accordingly, the Defendants' motion for summary judgment is granted. An appropriate Order accompanies this Memorandum Opinion.

## MEMORANDUM OPINION

Plaintiff Teresa Saunders filed suit against the District of Columbia, Natwar Gandhi, and Earl Cabbell asserting a number of claims arising out of the Plaintiff's termination from employment with the District. On August 2, 2013, the Court granted summary judgment in favor of the Defendants on all remaining claims, namely retaliation in violation of the False Claims Act, racial discrimination in violation of 42 U.S.C. § 1981, and deprivation of liberty without due process in violation of 42 U.S.C. § 1983. The Plaintiff, who is now proceeding *pro se*, seeks reconsideration of the Court's order with respect to the Plaintiff's False Claims Act charge. The Defendants oppose the Plaintiff's mo-

tion for reconsideration. Upon consideration of the pleadings,[1] the relevant legal authorities, and the summary judgment record, the Court finds no reason to set aside the final judgment. Accordingly, the Plaintiff's [117] Motion for Reconsideration is DENIED.

The Plaintiff's motion seeks two separate forms of relief: (1) an extension of time in which to file a notice of appeal; and (2) reconsideration of the Court's memorandum opinion granting summary judgment. The Court shall address the Plaintiff's request for an extension of time in the Order accompanying this Memorandum Opinion. Because the Plaintiff's motion was filed more than 28 days after the entry of final judgment, the Court shall construe the Plaintiff's motion for reconsideration as a motion for relief from judgment pursuant to Federal Rule of Civil Procedure 60(b).

██ Rule 60(b) dictates the grounds on which a party may move for relief from a final judgment. Subsections (b)(1)-(5) outline specific bases for relief, including mistake, excusable neglect, newly discovered evidence, and fraud. The only subsection that would appear to apply to the Plaintiff's motion is (b)(6), which permits a court to grant relief from a final judgment for "any other reason justifying relief." Fed.R.Civ.P. 60(b)(6). Motions under this subsection should not be granted unless the movant can show " 'extraordinary circumstances' justifying the reopening of a final judgment." *Salazar ex rel. Salazar v. District of Columbia,* 633 F.3d 1110, 1116 (D.C.Cir.2011) (quoting *Gonzalez v. Crosby,* 545 U.S. 524, 534, 125 S.Ct. 2641, 162 L.Ed.2d 480 (2005)). In exercising its discretion under Rule 60(b), the Court

"must balance the interest in justice with the interest in protecting the finality of judgments." *Summers v. Howard Univ.,* 374 F.3d 1188, 1193 (D.C.Cir.2004).

The Court presumes familiarity with the memorandum opinion granting summary judgment in favor of the Defendants. *Saunders v. District of Columbia,* 958 F.Supp.2d 222, 2013 WL 3964123 (D.D.C. Aug. 2, 2013). In relevant part, the Court held that

There is no evidence in the record that the individual who fired the Plaintiff (Dr. Gandhi) was aware of the Plaintiff's purported protected activities, all of which occurred over eight months before Dr. Gandhi was appointed as Chief Financial Officer. There is no evidence to suggest that Stanley Jackson was aware of the Plaintiff's purported activities, which occurred over eight months before Mr. Jackson was appointed Dr. Gandhi's chief of staff. The Plaintiff submitted a declaration from Mr. Jackson in support of her claims, but Mr. Jackson does not indicate that he had any knowledge of the Plaintiff's work on the Y2K project. Nor is there any evidence that the Plaintiff's supervisor (Mr. Cabbell) was aware of the Plaintiff's purported protected activities, the last of which occurred over nine months before the Plaintiff was assigned to the Special Projects Team. To the contrary, Mr. Cabbell denied knowing anything about the issues concerning financial statements from OCTO for the Y2K project, and the Plaintiff offers no evidence to rebut Mr. Cabbell's testimony.

Moreover, there is no evidence in the record to suggest Dr. Gandhi or Mr. Cabbell had any contact with Mayor

---

**1.** The Court's decision is based on the record as a whole, but the Court's analysis focuses on the following documents, in chronological order of filing: Defs.' Mot. for Summ. J. ("Defs.' Mot."), ECF No. [101]; Pl.'s Opp'n,

ECF Nos. [105, 107]; Defs.' Reply, ECF No. [110]; Pl.'s Mot. for Reconsideration ("Pl.'s Mot."), ECF No. [117]; Defs.' Opp'n, ECF No. [120].

Williams or Ms. Peck regarding the Plaintiff prior to her termination. All [Saunders] really offers is evidence that [s]he made a protected disclosure and that at a later time [s]he suffered a termination. The fact that one event precedes another does not in itself evidence causation.

*Id.* at 228, at *6 (citations omitted).

The Plaintiff takes issue with several aspects of the Court's description of the factual background for the Plaintiff's claims. Many of the Plaintiff's arguments are either immaterial or inaccurate. Overall, the Plaintiff in essence proffers a new theory of the case; the Plaintiff's motion for reconsideration suggests that Mr. Cabbell terminated the Plaintiff because Mr. Cabbell was upset with the Plaintiff's criticisms of Mr. Cabbell in the reports that constituted the Plaintiff's (purported) protected activity. During dispositive motion practice, the Plaintiff theorized that she was fired because *Ms. Peck* was upset with the contents of the Plaintiff's reports, and Ms. Peck used her political connections to the Mayor to convince Mr. Gandhi to terminate the Plaintiff. The Plaintiff is not entitled to set aside the final judgment in this matter and proffer a new theory of causation simply because her initial theory did not succeed. *Kramer v. Gates,* 481 F.3d 788, 792 (D.C.Cir.2007) ("Rule 60(b)(6) should be only sparingly used and may not be employed simply to rescue a litigant from strategic choices that later turn out to be improvident.") (citation omitted).

Even if the Court were to consider the Plaintiff's new *theory* of causation, the Defendants would still be entitled to summary judgment. The Plaintiff "disputes the fact that Defendant Cabbell had no knowledge of the financial management [of OCTO]" because Mr. Cabbell served as the interim Chief Financial Officer from June 1998 until June 1999. Pl.'s Mot. ¶ 4. As-

suming *arguendo* that Mr. Cabbell had actual knowledge of the financial issues at OCTO in connection with the Y2K project, there is no evidence that Mr. Cabbell had any knowledge of the Plaintiff's protected activity, all of which occurred *after* Mr. Cabbell left the position of interim CFO. The Plaintiff claims that her reports were critical of Mr. Cabbell, but she offers no evidence to suggest Mr. Cabbell was aware of the reports, the last of which was submitted nine months before the Plaintiff's termination, much less was upset with their contents. No reasonable jury could conclude from the record that Mr. Cabbell terminated the Plaintiff because of her protected activity. The Plaintiff's unsupported factual and legal assertions—all of which the Plaintiff could have but chose not to raise in opposition to the Defendants' motion for summary judgment—do not constitute "extraordinary circumstances" necessary to warrant relief from a final judgment.

For the foregoing reasons, the Court finds the Plaintiff failed to establish the final judgment in this matter should be set aside. Rule 60(b)(6) requires the Plaintiff to show "extraordinary circumstances" to justify disturbing a final judgment. In light of the failed theory of causation set forth in opposition to the Defendants' motion for summary judgment, the Plaintiff's motion now seeks to proffer a new theory of causation. Moreover, there is no evidence in the record to support the Plaintiff's new theory. The Court finds no basis for disturbing the final judgment entered on August 2, 2013. Accordingly, the Plaintiff's [117] Motion for Reconsideration is DENIED.

An appropriate Order accompanies this Memorandum Opinion.